**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

        Plaintiff,

                                  Case No. 21 CR 309 WJ

    vs.

ERIC M. GOMEZ,

        Defendant.

**MEMORANDUM IN SUPPORT OF
MOTION TO PRESERVE RIGHT TO JURY TRIAL**

Defendant Eric M. Gomez, by and through his counsel Paul Linnenburger of Lane Linnenburger Lane LLP, in support of his Motion to Preserve Right to Jury Trial states as follows:

**ARGUMENT**

**I.**    **Sixth Amendment Jurisprudence Requires a Return to the Historical Jury**

"The guarantees of a jury trial in the Federal and State Constitutions reflect a profound judgment about the way in which law should be enforced and justice administered," and it became how the people retained control over the third branch of government:

> A right to jury trial is granted to criminal defendants in order to prevent oppression by the Government. Those who wrote our constitutions knew from history and experience that it was necessary to protect against unfounded criminal charges brought to eliminate enemies and against judges too responsive to the voice of higher authority. The framers of the constitutions strove to create an independent judiciary but insisted upon further protection against arbitrary action. Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge. If the defendant preferred the common-sense judgment of a jury to the more tutored but perhaps less sympathetic reaction of the single judge, he was to have it.

*Duncan v. Louisiana*, 391 U.S. 145, 155-56 (1968); *see also United States v. Booker*, 543 U.S. 220, 239 (2005) (jury was a community body "to guard against a spirit of oppression and tyranny

on the part of rules"); *Blakely v. Washington*, 542 U.S. 296, 306 (2004) (the Sixth Amendment was "no mere procedural formality, but a fundamental reservation of power in our constitutional structure. Just as suffrage ensures the people's control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary."); *United States v. Haymond*, 139 S. Ct. 2369, 2375 (2019) ("the right to a jury trial sought to preserve the people's authority over [the Republic's] judicial functions").

It is beyond cavil that the jury trial is "fundamental to the American scheme of justice," *Sullivan v. Louisiana*, 508 U.S. 275, 277 (1993), and, in the Framers' eyes, is *the* cornerstone for preventing future tyranny. *Jones v. United States*, 526 U.S. 227, 246 (1999) (the Framers understood "other liberties would remain secure only so long as this palladium remains sacred and inviolate, not only from all open attacks, which none will be so hardy as to make, but also from all secret machinations, which may sap and undermine it"); *Booker*, 543 U.S. at 239 (jury acts "as the great bulwark of our civil and political liberties"); *Haymond*, 139 S. Ct. at 2375 (right to jury trial part of "the heart and lungs, the mainspring and the center wheel" of American liberties and without it "the body must die; the watch must run down; the government must become arbitrary"); *United States v. Datcher*, 830 F. Supp. 411, 413 (M.D. Tenn. 1993) ("The Founding Fathers knew that, absent jury nullification, judicial tyranny not only was a possibility, but was a reality in the colonial experience"), *overruling implicitly recognized by United States v. Chesney*, 86 F.3d 564 (6th Cir. 1995). The Framers believed the jury would serve as the protectorate of all other liberties through the exercise of its inherent nullification powers. *Jones*, 526 U.S. at 245 (through history, "[t]he potential or inevitable severity of sentences was indirectly checked by juries' assertions of a mitigating power when the circumstances…endowed a criminal conviction with particularly sanguinary consequences"); *see also Haymond*, 139 S. Ct. at 2375 (recognizing that juries perform

a supervisory authority over the judicial function by limiting a judge's power to punish and noting that historically "the concept of crime was a broad one linked to punishment" with specific sanctions known to jury members).

It was *this* jury – one with the knowledge and ability to practice nullification – the Framers intended to secure in the Sixth Amendment forever more. And it is *this* jury which this Court is constitutionally obligated to provide to Defendant.

## II.     The Jury Must Be Properly Instructed as to its Authority to Determine Law

Supreme Court precedence commands this Court allow the jury to exercise the same role as at the time of the Framers. The Framers' words and actions show they celebrated the petit jury openly practicing nullification in their time. Thus, the Sixth Amendment guarantees no less.

### A.     Modern Aversion to Jury Determination of Law Diverges from Common Law

Eight centuries ago, the English Crown subjugated its people through the prosecution of unjust laws. To protect themselves from future tyranny, the people demanded independent juries play a vital role in their hard-fought freedom. As a result, out of the Magna Carta, the Anglo jury was born. The jury remained the cornerstone of Anglo justice for centuries, and during colonial times, American juries stood firm in peaceful opposition to arbitrary and tyrannical British rule and refused to enter convictions. C.S. Conrad, *Jury Nullification: The Evolution of a Doctrine*, p. 45 (Carolina Academic Press, NC, 1998). At the time, jury nullification was celebrated, and top lawyers openly advocated for its practice.

One of the most famous examples is the 1733 trial of John Peter Zenger for libel. In the mid-18[th] Century, truth was no defense to a charge of libel, but it was the only defense Zenger argued to the jury after he admitted all of libel's legal elements. If Zenger were tried today, the pattern instructions would instruct the jury it "must" find Zenger guilty, but in colonial America,

Andrew Hamilton properly reminded the jury of its historical power and sacred duty:

> I know they have the right beyond all dispute, to determine both the law and the
> fact, and where they do not doubt of the law, they ought to do so.

L.W. Levy, *Freedom of the Press from Zenger to Jefferson*, p. 51 (Carolina Academic Press, North

Carolina, 1996). Hamilton's closing in *Zenger* is actually an impassioned defense of nullification:

> A proper Confidence in a Court is commendable; but as the Verdict (whatever it is)
> will be yours, you ought to refer no Part of your Duty to the Discretion of other
> Persons…. We ought to take Care of our own. For tho' Blessed be God, I live in a
> Government where Liberty is well understood, and freely enjoy'd; yet Experience
> has shewn us all (I'm sure it has to me) that a bad Precedent in one Government, is
> soon set up for an Authority in another; and therefore I cannot but think it mine,
> and every Honest Man's Duty, that (while we pay all due Obedience to Men in
> Authority) we ought at the same Time to be upon our Guard against Power,
> wherever we apprehend that it may affect ourselves or our Fellow-Subjects.

*Id.* at 58. The jury took his words to heart, and, choosing to act, not as minions of the sovereign,

but as free people exercising the community's conscience, it refused to convict Zenger. Similar

acquittals became commonplace as royal laws were increasingly viewed as unjust and nullification

continued to be acknowledged and celebrated. By 1771, just prior to independence, John Adams

was declaring a juror's duty "to find the verdict according to his own best understanding, judgment,

and conscience, though in direct opposition to the direction of the court," because "[t]he English

law *obliges no man to decide a cause upon oath against his own judgment*." *Sparf v. United States*,

156 U.S. 51, 144 (1895) (quoting Adams) (Gray, J., dissenting).

> B.    Aversion to Jury Determination of Law Diverges from Framers' Understanding

Considering the above, the directives within current pattern jury instructions that jurors

"must" follow the judicial pronouncements of law, and that is their "duty" to do so are not in tune

with the Framers' understanding of the jury's proper role. Those instructions, which demand a

jurors' adherence to the court's direction and deny his/her ability to determine the law in

accordance with their communal conscience, amount to affirmative misstatements and improper

4

suggestions of punishment and invalidity of judgments if jurors do exercise their communal conscience. *See e.g., United States v. Kleinman*, 880 F.3d 1020, 1032 (9th Cir. 2017); *United States v. Lynch*, 903 F.3d 1061, 1088 (9th Cir. 2018) (Watford, J., dissenting) ("…at the time of the Founding, the ability of jurors to disobey judicial instructions without fear of official reprisal was not in doubt."). As shown below, those current instructions necessarily violate the right to trial by jury enshrined in the Sixth Amendment because of this deviation. *Sullivan*, 508 U.S. at 178.

1. *The Founders specifically sought to protect the proper function of the jury*

The Framers were especially concerned with the contours of the right to jury trial, *see Jones*, 526 U.S. at 244 ("on a general level the tension between jury powers and powers exclusively judicial would likely have been very much to the fore in the Framers' conception of the jury right."), and thus they left an ample historical record on how they defined the jury's role. An examination of this record indicates modern distaste for nullification unconstitutionally deviates from the Independence-era jury as well.

As more and more colonial juries acted to nullify laws, the British crown leaned heavily on jury-less maritime courts to remove the people as an obstruction to tyranny. Conrad at 45. This was viewed by the colonists as a direct threat to their liberty such that it formed an important catalyst to independence. When the time came to form *their own* government, the Framers' distaste for the crown's injustice remained.

Thus, while they disagreed on many matters, there was no disagreement amongst the Framers as to the jury's role in preserving freedom forward:

> The friends and adversaries of the plan of the Convention, if they agree in nothing else, concur at least in the value they set upon the trial by jury. Or if there is any difference between them, it consists in this; the former regard it as a valuable safeguard to liberty, the latter represent it as the very palladium of free government.

Hamilton, A., *The Federalist No. 83*, at 456 (Scott ed. 1894). This was documented by other

5

Framers, such as Thomas Jefferson, who wrote often on the role of the jury, calling it "the only anchor ever yet imagined by man, by which a government can be held to the principles of its constitution." *The Writings of Thomas Jefferson*, p. 71 (Washington D.C., Taylor & Maury, 1853).

In fact, Jefferson believed the jury to be *the* irreplaceable bit of public participation:

> Were I called upon to decide whether the people had best be omitted in the Legislative or Judiciary department, I would say it is better to leave them out of the Legislature. The execution of the laws is more important than the making them.

*The Works of Thomas Jefferson*, Federal Ed., Vol. V., p. 485 (New York and London, G.P. Putnam's Sons, 1904-05). In 1789, he expressed concern to his friend L'Abbe Arnond that tyranny may grow if the people did not maintain this absolute authority:

> We all know that permanent judges acquire an esprit de corps, that being known they are liable to be tempted to bribery, that they are misled by favor, by relationship, by a spirit of party, by a devotion to the Executive or Legislative; that it is better to leave a cause to the decision of cross and pile, than to a judge biased to one side; and that the opinion of 12 honest jurymen gives still a better hope of right, than cross and pile does. It is therefore left to the juries, if they think the permanent judges are under any bias whatever in any cause, to take upon themselves to judge the law as well as the fact. They never exercise this power but when they suspect partiality in the judges, and by the exercise of this power they have been the firmest bulwarks of English liberty.

*The Works of Thomas Jefferson*, p. 485.

Jefferson was not alone in this belief as it was widespread amongst the founding generation, *see Taylor v. Louisiana*, 419 US. 522, 531 (1975) (the jury's historical purpose was "to guard against the exercise of arbitrary power-to make available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps overconditioned or biased response of a judge"), including revolutionary attorney Alexander Hamilton, who declared "the real danger [to liberty] was not from a few provisional troops…. [rather] the road to tyranny will be opened by making dependent judges." *People v. Croswell*, 3 Johns. Cas. 337, 359 (N.Y.1804) (citing argument of Hamilton).

The Framers were intently focused on the jury and its role and their words and actions provide ample guidance as to how this Court should address the jury's role. As shown below, those words and actions highlight the unconstitutional nature of current practices.

        2.       *The Framers Words and Actions Show They Did Not Trust Judicial Pronouncement of Law*

The Framers acknowledged and celebrated the jury's duty to nullify. Unlike modern instructions that direct jurors to avoid deviation from judicial pronouncements of law, juries of the new Republic received encouragement to exercise independent judgment in their role as the community administrators of justice. "To members of the Founding generation with fresh memories of the colonists' experience under royal judges, the jury's independence from control by the judiciary provided assurance that application of national law would rest in the hands of local citizens attuned to the concerns of their community, not in the hands of officials beholden to a distant central government." *Lynch*, 903 F.3d at 1088 (Watford, J., dissenting).

In this context, constitutional convention representatives, such as Theophilus Parsons of Massachusetts openly praised jury nullification:

> Let him be considered as a criminal by the general government; yet only his fellow-citizens can convict him. They are his jury, and, if they pronounce him innocent, not all the powers of congress can hurt him; and innocent they certainly will pronounce him *if the supposed law he resisted was an act of usurpation*.

*Sparf*, at 144 (quoting Parsons) (Gray, J., dissenting). Moreover, prominent litigators argued openly for nullification after independence. For instance, colonial advocate Alexander Hamilton declared during the 1804 case of *Croswell*:

> …[if] the jury are satisfied from the arguments of counsel, the law authorities that are read, and their own judgment, upon the application of the law to the facts (for the criminal law consists in general of plain principles,) that the law arising in the case is different from that which the court advances, are they not bound by their oaths, by their duty to their creator and themselves, to pronounce according to their own convictions?

7

*Croswell*, 3 Johns. Cas. at 355. Hamilton went on to clarify the proper relationship between the court and the jury:

> …the court are the constitutional advisors of the jury, in matters of law, who may compromit their consciences by lightly or rashly disregarding that advice; but may still more compromit their consciences by following it, if, exercising their judgments with discretion and honesty, they have a clear conviction that the court is wrong.

*Croswell*, 3 Johns. Cas. at 362. While Hamilton's argument would be shut down in any modern courtroom, the *Croswell* Court agreed with his assessment and recognized "[t]his right in the jury to determine the law as well as the fact *has received the sanction of some of the highest authorities in the law*." *Id.* at 367 (emphasis added).

One such "highest authority" to sanction nullification was none other than the first Chief Justice of the United States Supreme Court, John Jay. In the 1794 case of *Georgia v. Brailsford*, Chief Justice Jay highlighted the jury's proper role in determining the law in his instructions:

> The facts comprehended in the case, are agreed; the only point that remains, is to settle what is the law of the land arising from those facts; and on that point, it is proper, that the *opinion* of the court should be given…. It may not be amiss, here, Gentlemen, to remind you of the good old rule, that on questions of fact, it is the province of the jury, on questions of law, it is the province of the court to decide. But it must be observed that by the same law, which recognizes this reasonable distribution of jurisdiction, *you have nevertheless a right to take upon yourselves to judge of both, and to determine the law as well as the fact in controversy*. On this, and on every other occasion, however, we have no doubt, you will pay that respect, which is due to the opinion of the court; For, as on the one hand, it is presumed, that juries are the best judges of facts; it is, on the other hand, presumable, that the court are the best judges of law. *But still both objects are lawfully within your power of decision.*

*Georgia v. Brailsford*, 3 U.S. 1, 4 (1794) (emphasis added).

The historical record is clear. The Framers acknowledged the jury's right, and duty, to decide the law in accordance with their communal sense of justice. Modern instructions requiring absolute obedience to judicial pronouncements of law are a complete reversal from these historical

roots and are a dangerous step towards tyranny which would not be accepted by the Framers and inappropriately suggest jurors may be punished for deviation from those judicial pronouncements.[1]

Defendant's proposed instruction accurately describes the Framers' understanding of the jury's duty. They are thus constitutionally appropriate and should be given.

### III.   The Jury Needs Sentencing Information to Perform its Intended Function

It is not enough for courts to cease misinforming jurors about their right and duty to determine the law in accordance with their sense of justice. If the modern juror is to exercise the role of the common law juror, they require information as to the sentencing ramifications of their verdict. After all, this information was readily known to the common law juror, who used it to manipulate verdicts if required by their own sense of justice. *Jones*, 526 U.S. at 245; *Sparf*, 156 U.S. at 110-183 (Gray, J., dissenting); *United States v. Dougherty*, 473 F.2d 1113, 1138-1144 (D.C. Cir. 1972) (Bazelon, J., concurring in part and dissenting in part); *United States v. Polouizzi*, 549 F. Supp. 2d 308, 402-450 (E.D.N.Y. 2008) (Weinstein, J.), *rev'd* 564 F.3 142; *United States v. Datcher*, 830 F. Supp. 411 (M.D. Tenn. 1993), *reversal implicitly recognized United States v. Chesney*, 86 F.3d 564, 574 (6th Cir. 1995); L.M. Friedman, *Crime and Punishment in American History*, p. 41 (BasicBooks, NY, 1993) (reviewing history of jury nullification of capital punishment in adultery cases); E. Dale, *Criminal Justice in the United States, 1790 – 1920: A*

---

[1] These concerns have returned to the forefront nationally and locally. In recent pre-pandemic years in New Mexico the public pushed back against permanence in the judiciary with their voices and votes. *See* Boetel, Ryan, *"4 ABQ judges should lose seats, panel says"*, Albuquerque Journal, Sept. 14, 2018, *available at* https://www.abqjournal.com/1220805/commission-recommends-four-metro-court-judges-lose-their-seats.html; Nguyen, Jeannie,*"Website calls for New Mexicans to 'fire' judges during 2018 election"*, KRQE, Jan. 15, 2018, *available at* https://www.krqe.com/news/website-calls-for-new-mexicans-to-fire-judges-during-2018-election/; Barnitz, Katy, "*Democrats poised to sweep five top statewide judicial spots*", Albuquerque Journal, Nov. 6, 2018, *available at* https://www.abqjournal.com/1242771/five-top-judicial-spots-contested.html.

*Government of laws or men?* p. 149 (Cambridge University Press, NY, 2008) (citing low conviction rates). Defendant's second requested instruction will provide the jury with the same knowledge the common law juror already possessed. As a result, Defendant's jury will also be able to determine a verdict in accordance with the community's sense of justice as intended.

A.     The Framers' Believed Sentencing Information Was Necessary to the Jury's Role

Although the common law jury did not directly sentence defendants, it knowingly manipulated verdicts if it disagreed with the sentence to be imposed. *Jones*, 526 U.S. at 245 ("The potential or inevitable severity of sentences was indirectly checked by juries' assertions of a mitigating power when the circumstances of a prosecution pointed to political abuse of the criminal process or endowed a criminal conviction with particularly sanguinary consequences"). At times, as in the *Zenger* case, juries accomplished this through outright acquittal. Other times, juries entered compromise verdicts to lesser offenses (with known lesser penalties). *Id.* ("manifestations of what Blackstone described as 'pious perjury' on the jurors' part."). However manifested, this practice served an important function because it "permit[ed] the jury to bring to bear on the criminal process a sense of fairness and particularized justice." *Dougherty*, 473 F.2d at 1142 (Brazelton, J., concurring in part and dissenting in part).

The Framers implicitly recognized the necessity of an informed jury to bring this fairness and particularized justice were to function as advertised:

> …even if the jury has no right to set a general sentence, it must retain the power to veto a sentence in a particular case if its oversight function is to be fulfilled.

A. Hamilton, *The Federalist No. 83* (Jacob E. Cooke Ed., 1961). The Framers understood the jury could only serve its proper role if it retained the power to veto a sentence. But to veto a sentence, the jury must *know* the sentence. At the nation's founding, it had this knowledge. Through history and growing complication of criminal law, this knowledge was lost.

10

B.    Modern Jurors Must Be Provided the Information to Properly Execute Their Role

During the majority of American history, jurors *did know* the sentence. Juror ignorance of sentences is a distinctly modern phenomenon. At the time of the Framers, juries only sat in felony cases that carried fixed sentences, *Jones*, 526 U.S. at 244, often death.[2] "[T]he gallows anchored criminal justice in America as it did in Great Britain," and hanging was a communal process, so the citizenry knew the punishment for crime.[3] Moreover, well into the Antebellum Era, several states explicitly provided juries with the power to set sentences.[4]

The United States was a century old, and the Anglo jury even older, before indeterminate sentencing truly appeared on the scene, and when it did, jurors lost their knowledge of the criminal sentence.[5] However, it did not catch on until well into the 20th Century and has only taken majority hold in the last generation.

As of 1911 only *nine* states had indeterminate sentencing schemes. The practice did not become commonplace until the 1960's.[6] At the same time this practice was expanding in the 20th Century, the criminal law itself saw an ever-increasing complexity and the jury pool significantly expanded. These forces combined to ensure that the modern juror cannot possibly understand the consequences of their verdict. Without this understanding, they cannot know the essence of the charges they are asked to decide, exercise their veto power, or otherwise protect the people.

---

[2] S. Shane-DuBow, *Sentencing Reform in the United States: History, Content, and Effect*, p. 3 (National Institute of Justice, Wash. D.C., 1985).
[3] M. Meranze, *Penalty and the Colonial Project: Crime, Punishment, and the Regulation of Morals in Early America*, Cambridge History of Law in America V. 1, p. 185-186 (Cambridge University Press, NY, 2011).
[4] Dale, *supra* at 150.
[5] Shane-Dubow, *supra* at 5.
[6] Shane-Dubow, *supra* at 6.

C.     The Modern Jury Must Be Provided Sentencing Information

Unfortunately, one aspect of the historical jury has returned. With the advent of increasingly harsh sentencing laws, "federal juries today again face-*albeit often unknowingly*-'either-or' choices similar to those facing the British and colonial juries of 1791." *Polouizzi*, 549 F. Supp. 2d at 420 (emphasis added). While the harsh consequences have returned, including through excessively punitive recommended Guideline sentencing ranges, the juror's knowledge of the ramifications of a verdict remains decidedly lacking. Attorneys for both the prosecution and the defense relay countless tales of the juror shocked to learn the sentencing consequences of a verdict *after* the verdict is rendered. Unfortunately, without this information, the jury is denied the veto power so necessary to its oversight function.

The problematic nature of the current criminal justice system is recognized by leading national leaders. Senator Ted Cruz, in his essay "*Reduce Federal Crimes and Give Judges Flexibility*", *available at* https://www.brennancenter.org/analysis/reduce-federal-crimes-and-give-judges-flexibility, noted that modern times oversaw an "explosion" of new additions to the federal criminal code coupled with Draconian sentences. As Senator Cruz noted, the result is a "demise of jury trials." Given the crucial importance of the jury in maintaining our freedoms, this is a severely disconcerting advancement that must be reversed, and it can only be reversed when the jury again has the knowledge needed to perform its intended function.

The current practice of hiding sentencing information from the jury creates a *de facto* denial of the jury's power as the Framers understood it. It is a driving force behind the "demise" of the jury and the system now provides too much power to the prosecutorial authorities and the judiciary – power the Framers intended to stay with the jury. Defendant's proposed instruction reverse this unconstitutional trend and provide the jury with the information needed for the jury to serve the

true "oversight function" the Framers intended.

## IV.    Justice Requires Trust in the Jury

The modern practice of misinforming the jury about its duty to determine the law and withholding sentencing information relies on a simple, untenable proposition; the jury cannot be trusted with information that might lead to nullification. This modern aversion to nullification "evinces a fear that the jury might actually serve its primary purpose, that is, it evinces a fear that the community might in fact think a law unjust." *Datcher*, 830 F. Supp. at 415. In other words, it is a fear that the community will make its voice heard in precisely the way the Framers intended.[7] As the Framers understood, "the government, whose duty it is to seek justice and not merely a conviction, should not shy away from having a jury know the full facts and law of a case." *Id.* "Trust in the jury is, after all, one of the cornerstones of our entire criminal jurisprudence, and if that trust is without foundation, we must re-examine a great deal more than just the nullification doctrine." *Dougherty*, 473 F.2d at 1143 (Bazelon, J., concurring in part and dissenting in part).

Permitting the criminal justice system to be controlled by an unjustifiable and unconstitutional fear of juries throws open the door to tyranny, a door the Framers expected the Sixth Amendment would lock permanently. Current events, nationally and locally, serve as a reminder that the conscience of the public is not necessarily represented by far-away "representatives" or judicial officers. In addition to the rise of anti-establishment and populist

---

[7] And they very well may, particularly given the deep resentment, distrust and disconnect citizen's feel with their national government. *See American's Views of Government: Decades of Distrust, Enduring Support for Its Role*, PEW RESEARCH CENTER (June 6, 2022), available at https://www.pewresearch.org/politics/2022/06/06/americans-views-of-government-decades-of-distrust-enduring-support-for-its-role/ (noting only 27% of Americans belief "careful with taxpayer money" describes the federal government and that state and local governments fare significantly better overall in citizen's attitudes).

candidates,[8] the people of New Mexico have pushed back against permanence in the judiciary with their voices and their votes. Sentiments from some of those anti-establishment representatives highlight the concerns of the broader public that suggest they yearn for greater control through the jury process. *See* Cruz, *"Reduce Federal Crimes and Give Judges Flexibility"* (discussing "overcriminalization, harsh mandatory minimum sentences, and the demise of jury trials" as pervasive to criminal justice system).

The consequences of denying nullification are far greater than the consequences of returning the jury to its proper place:

> The first object of any tyrant in [Washington] would be to make [Congress] utterly subservient to his will; and the next to overthrow *or diminish* trial by jury, for no tyrant could afford to leave a subject's freedom in the hands of twelve of his countrymen. So that trial by jury is more than an instrument of justice and more than one wheel of the constitution: it is the lamp that shows that freedom lives.

*Duncan*, 391 U.S. at 156, n. 23 (quoting P. Devlin, *Trial by Jury*, p. 164 (1956)).

In this context, counsel acknowledges the relief requested may be "messy" and a deviation from the current conduct of trials. However, the criminal justice system is not meant to be "clean and tidy," it is meant to be just. Overtime, the system has shifted to focus on cleanliness rather than justice, but acceptance of a change over time does not automatically make that change correct. Justice Gorsuch suggested as much when he noted that, "[w]hile trial practices can change in the course of centuries and still remain true to the principles that emerged from the Framers' design… [the Supreme Court] has not hesitated to strike down innovations that fail to respect the jury's supervisory function." *Haymond,* 139 S. Ct. at 2377. And, as Justice Alito recently noted, any interest in maintaining relatively recent judicial developments "does not compel unending

---

[8] *See "Anti-establishment wave 'very much in play' in midterms, says pollster"*, The Hill TV, Nov. 5, 2018, *available at* https://thehill.com/hilltv/what-americas-thinking/415008-anti-establishment-wave-very-much-in-play-in-midterms-says. *See also* American's Views, *supra* note 7.

adherence to [the] abuse of judicial authority." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2243 (2022).

Other modern courts have acknowledged this and shown a willingness to return to the true jury role. *See e.g., State v. Wentworth*, 395 A.2d 858 (N.H. 1978) (approving jury instruction that does not require conviction with finding beyond a reasonable doubt); *State v. Preston*, 442 A.2d 992 (1982) (approving jury instruction permitting jury to act on "conscientious feeling about what is a fair result in the case"). This Court should do the same. The jury should understand the potential recommended penalties associated with a conviction in this matter and the true nature of their role.

Defendant's proposed instructions will uphold the jury as an instrument of justice and ensure the lamp of freedom lives. They are not legitimately objectionable and should be given.

Respectfully submitted,

*/s/ Paul Linnenburger*
PAUL LINNENBURGER
Lane + Linnenburger + Lane LLP
P.O. Box 6622
Albuquerque, New Mexico 87107
Ph:    505.226.7979
Email: paul@attorneyslane.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 5th day of December 2023, I filed this pleading electronically through the CM/ECF system, which caused the following counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

> Jon Stanford
> United States Attorney's Office
> District of New Mexico
> 201 3rd Street NW, Suite 900
> Albuquerque, New Mexico 87102

*/s/ Paul Linnenburger*